UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

NOCO INC.,
NOCO ELECTRIC, LLC,

                              Plaintiffs,

                                                          DECISION AND ORDER

                                                          13-CV-6487L

            v.

ROCHESTER GAS AND ELECTRIC CORPORATION,
AMERICAN POWER PARTNERS LLC,
US ENERGY PARTNERS, LLC,

                              Defendants.
_____


        This case was brought by plaintiffs NOCO Inc. and NOCO Electric, LLC (collectively

"NOCO"), in New York State Supreme Court, Monroe County, against Rochester Gas and

Electric Corp. ("RG&E"), American Power Partners LLC ("APP") and US Energy Partners, LLC

("USEP").  RG&E removed the case to this Court based on this Court's original jurisdiction

under 28 U.S.C. § 1331.

        The factual allegations will be explained in more detail below, but in short, NOCO

contends that due to certain actions of RG&E, it has overpaid, to the tune of over one million

dollars, for electric capacity provided by RG&E.  NOCO further alleges that its overpayment has

inured to the benefit of USEP (which is a subsidiary of APP).  NOCO asserts several claims

under state law to recover damages from defendants.  NOCO has not asserted any claims under

federal law.

        RG&E has moved to dismiss the complaint, on several grounds.  NOCO has moved to

remand the action to state court.  APP and USEP, which have answered the complaint, oppose

NOCO's motion to remand.

**BACKGROUND**

NOCO is an energy service company ("ESCO") that provides electric power to consumers.  USEP is also an ESCO, and is a competitor of NOCO.  RG&E is a utility company that is engaged in the business of distributing electricity and natural gas in a nine-county service area in upstate New York.

The relevant contractual and regulatory framework is not disputed here, which is not to say that it is entirely simple.  As a result of legislative changes affecting the energy industry in New York in the late 1990s, consumers can now choose which ESCO to use to supply their electric power.  ESCOs, however, typically do not themselves generate electric power; rather, they purchase power generated by utilities such as RG&E (also referred to as "generators"), and deliver it to end users by means of the infrastructure owned by the generators.  To that end, NOCO has entered into "partnering" agreements with several utility companies, including RG&E, under which NOCO is permitted to use the utilities' transmission lines to deliver electricity to NOCO's customers.

To ensure that they will be able to provide adequate power to their customers, ESCOs must obtain a reliable supply of electric capacity on a regular basis.  Electric capacity is not the same as electric power.  "Capacity" refers to the amount of electricity that a generator of power, such as RG&E, commits to make available to the ESCO at an agreed-upon time.  How much power the ESCO actually uses, *i.e.*, transmits to its customers, depends on the customers' actual usage.  But to avoid service interruptions, it is important for the ESCO to secure enough capacity from the generator to make sure that the ESCO will be able to satisfy its customers' demands.  In short, the ESCO needs to ensure that the generator will provide it with enough capacity to meet the ESCO's customer's needs.

ESCOs obtain electric capacity by bidding in monthly wholesale auctions of electric power.  These auctions are conducted by the New York Independent System Operator

("NYISO"), a nonprofit company that is responsible for overseeing certain aspects of New York's electricity industry.

NYISO, then, conducts monthly auctions of wholesale electric capacity.  The sellers are generators, like RG&E.  The buyers are ESCOs, like NOCO.  Complaint ¶ 19.  NYISO acts as an intermediary between the two.  Complaint ¶ 20.

Pursuant to agreements between the ESCOs and the generators, prior to every monthly auction, each generator, *i.e.*, owner of transmission lines, advises NYISO of the specific capacity that it expects will be required by each ESCO with which it does business.  That estimate is based on the historical consumption of the customers of each ESCO.  Using those estimates, NYISO then prepares a "Capacity Load Forecast" for the coming month.  Complaint ¶ 25.

Two days before the auction, NYISO discloses the electric capacity allocated to each ESCO.  Based on that figure, each ESCO submits a bid for the capacity assigned to it.  Complaint ¶¶ 25, 26.  NYISO then conducts the auction and determines the settlement price, *i.e.*, the price at which the generator must sell and the buyers must buy electric capacity.  If the ESCO's bid price is lower than the settlement price, then the ESCO must buy additional capacity to meet its needs in a "spot" auction, which is also conducted by NYISO.  Complaint ¶ 27.

NOCO alleges that, in accordance with this general arrangement, it had entered into an "Operating Agreement" with RG&E (Dkt. #8-3), pursuant to which RG&E agreed to provide specified services to NOCO, including making available electric capacity.  NOCO further alleges that under the Operating Agreement, RG&E was required to provide NOCO with RG&E's "capacity load forecasts," *i.e.*, the figures submitted by RG&E to NYISO in advance of each monthly auction, regarding the anticipated capacity requirements for NOCO in the coming month.  According to the complaint, this provision in the agreement would allow[] NOCO to verify that RG&E was giving NYISO accurate information regarding NOCO's capacity requirements.

- 3 -

The present dispute relates to NOCO's allegation that in November 2007, RG&E began combining the electric power capacity requirements of NOCO and USEP together.  In other words, RG&E was giving NYISO the combined expected energy needs of both NOCO and USEP, and representing them as the needs of NOCO alone.  Complaint ¶ 32.  At least for purposes of the present motions, RG&E does not appear to deny these allegations.

NOCO alleges that it did not realize that this was occurring, for some time.  NOCO assumed that RG&E's submissions to NYISO, insofar as they related to NOCO, were based solely on NOCO's figures, as they should have been.

Unaware that RG&E was combining NOCO's and USEP's numbers, NOCO prepared and submitted its monthly bids for the capacity auction based on the capacity requirements reported by NYISO two days before each auction.  In effect, then, NOCO was unknowingly paying for both its and USEP's capacity requirements.

NOCO alleges that it was not until June 2013 that it became aware that RG&E had been combining its capacity requirements with USEP's.  NOCO states that it has determined that as a result of its overpayments from 2007 to 2013, USEP received a windfall of over $1 million.  NOCO alleges that RG&E has expressly conceded its error in combining NOCO's and USEP's capacity requirement.  Complaint ¶ 36.  Nevertheless, both RG&E and USEP have refused NOCO's demands that they reimburse NOCO for its overpayments.

NOCO filed this action in state court in August 2013.  NOCO asserts claims for:  (1) breach of contract by RG&E; (2) conversion by RG&E; (3) breach of implied contract by USEP; (4) unjust enrichment by USEP; and (5) conversion by USEP.

RG&E removed the action to this Court about a month later.  RG&E then filed its motion to dismiss, and NOCO cross-moved to remand the action to state court.

- 4 -

**DISCUSSION**

**I. Motion to Remand**

Questions relating to the court's subject matter jurisdiction must be addressed before moving on to the merits of a claim.  *See United States v. Bond*, 762 F.3d 255, 263 (2d Cir. 2014) ("Subject matter jurisdiction is a 'threshold question that must be resolved ... before proceeding to the merits'") (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 88-89 (1998)).  *See also Holt v. Town of Stonington*, 765 F.3d 127, 130 (2d Cir. 2014) ("we must address jurisdictional questions before reaching the merits") (quoting *Leveraged Leasing Admin. Corp. v. PacifiCorp Capital, Inc.*, 87 F.3d 44, 47 (2d Cir. 1996)); *Abdale v. North Shore-Long Island Jewish Health System, Inc.*, No. 13-CV-1238, 2014 WL 2945741, at *2 (E.D.N.Y. June 30, 2014) ("Although Defendants' motion to dismiss the Complaint was filed before Plaintiffs' motion for remand, the Court first must decide the motion for remand since it raises questions of subject matter jurisdiction"); *Macro v. Independent Health Ass'n, Inc.*, 180 F.Supp.2d 427, 431 (W.D.N.Y. 2001) (stating that "when an action is removed from state court, the district court first must determine whether it has subject matter jurisdiction over the claims before considering the merits of a motion to dismiss," and that "if removal was inappropriate, the court must remand for lack of subject matter jurisdiction, notwithstanding the pendency of the other motions").

The overriding principle in any case involving a removal from state court is that "[a]ny action that was originally filed in state court may be removed by a defendant to federal court only if the case originally could have been filed in federal court."  *Marcus v. AT & T Corp.*, 138 F.3d 46, 52 (2d Cir. 1998) (citing 28 U.S.C. § 1441(a)).  The purported basis for removal here is that this Court has original jurisdiction over the complaint because plaintiff's claims present questions under federal law.  RG&E asserts that this Court has "federal question" jurisdiction under 28 U.S.C. § 1331, which provides that "[t]he district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws or treaties of the United States."

- 5 -

Whether a federal district court has federal question jurisdiction over an action is governed by the "well-pleaded complaint rule," under which "federal question jurisdiction exists only if plaintiff's statement of his own cause of action shows that it is based on federal law. Under the well-pleaded complaint rule, then, plaintiff is the master of his complaint and is free to avoid federal jurisdiction by pleading only state claims even where a federal claim is also available." *Romano v. Kazacos*, 609 F.3d 512, 518 (2d Cir. 2010) (internal quotes omitted). That rule is one of long standing. *See Louisville & Nashville R.R. Co. v. Mottley*, 211 U.S. 149, 152 (1908) (a suit "arises under" federal law "only when the plaintiff's statement of his own cause of action shows that it is based upon [federal law]"); *Gully v. First Nat'l Bank*, 299 U.S. 109, 117 (1936) (federal question must be presented by the specific controversy presented, not by some potential federal issue "lurking in the background") (Cardozo, J.); *Aetna Health Inc. v. Davila*, 542 U.S. 200, 207 (2004) ("Ordinarily, determining whether a particular case arises under federal law turns on [whether a federal question] necessarily appears in the plaintiff's statement of his own claim") (internal quotation marks omitted).

As a corollary to that rule, however, the "artful pleading" rule provides that a plaintiff cannot avoid removal by deliberately declining to plead "necessary federal questions." *Rivet v. Regions Bank*, 522 U.S. 470, 475 (1998). Courts will therefore "look beyond the face of an 'artfully pled' complaint to determine whether plaintiff has 'cloth[ed] a federal law claim in state garb' by pleading state law claims that actually arise under federal law." *Romano*, 609 F.3d at 518 (quoting *Travelers Indem. Co. v. Sarkisian*, 794 F.2d 754, 758 (2d Cir. 1986)). "If such is the case, the reviewing court will 'uphold removal even though no federal question appears on the face of the complaint.'" *Id.* (quoting *Rivet*, 522 U.S. at 475).

NOCO contends that this action should be remanded to state court, where it was brought, because it presents only claims under state law. RG&E, however, asserts that "Plaintiff's claims relate entirely to the rights and duties of the Plaintiffs and RG&E with respect to certain [federal] tariffs involving the transmission of electric energy." Dkt #1 at 2 ¶ 6.

Having reviewed the pleadings, and the exhibits submitted by both sides, I conclude that the complaint here does not present a federal question, and that there is no basis for subject-matter jurisdiction in this Court.  I therefore grant plaintiff's motion to remand.

As a starting point, I note that "the removal statute, like other jurisdictional statutes, is to be strictly construed." *Whitaker v. American Telecasting, Inc.*, 261 F.3d 196, 201 (2d Cir. 2001); *see also In re Methyl Tertiary Butyl Ether Prod. Liab. Litig.*, 488 F.3d 112, 124 (2d Cir. 2007) ("out of respect for the limited jurisdiction of the federal courts and the rights of states, we must resolve any doubts against removability") (internal quotes and alteration omitted); *Ritchie Capital Management, LLC v. General Elec. Capital Corp.*, __ F.Supp.3d __, 2015 WL 170402, at *3 (S.D.N.Y. Jan. 13, 2015) ("As a general matter, removal jurisdiction must be 'strictly construed,' and any doubts should be resolved against removability") (quoting *Syngenta Crop Prot., Inc. v. Henson*, 537 U.S. 28, 32 (2002)).

In that regard, RG&E's notice of removal stated that "adjudication of the Plaintiffs' claims will require interpretation of federal law."  Dkt. #1 at 2 ¶ 6.  The Second Circuit has made clear, however, that "a suit seeking recovery under state law is not transformed into a suit 'arising under' federal law [and thus into an action removable to federal court] merely because, to resolve it, the court may need to interpret federal law."  *Sullivan v. American Airlines, Inc.*, 424 F.3d 267, 271 (2d Cir. 2005).  *See also Bonnafant v. Chico's FAS, Inc.*, 17 F.Supp.3d 1196, 1199-1200 (M.D.Fla. 2014) (stating that "[t]he assertion in the Notice of Removal that the state law claim is removable simply because it 'requires the interpretation of federal law' is clearly incorrect") (citing *Merrell Dow Pharm. Inc. v. Thompson*, 478 U.S. 804, 813 (1986)).

Rather, with respect to federal question jurisdiction, the operative issue is whether plaintiff's claims *arise* under federal law, *i.e.*, whether plaintiff's claims turn on substantial issues of federal law, or require the application of federal law, as opposed to the *interpretation* of federal law, ancillary to plaintiff's claims under state law.  *See Grant v. Sun Constr., LLC*, Civ. No. 13-6032, 2013 WL 6198866, at *2 (E.D.La. Nov. 27, 2013) (citing *Grable & Sons Metal*

*Prods.*, *Inc. v. Darue Eng'r & Mfg.*, 545 U.S. 308, 312-13 (2005)).  Because both sides here have addressed the question of whether plaintiff's claims arise under federal law, the Court will overlook the seeming inadequacy of the notice of removal, and address that issue.

Several documents govern the parties' relationship, and they must be the starting point for the Court's analysis.  The document that most directly governs the parties' relationship is the Operating Agreement.  That agreement, however, incorporates by reference the terms and conditions of several other documents, including "[a]pplicable Federal and New York State laws, together with rules, codes, regulations, policies and procedures" of the New York State Public Service Commission, the Federal Energy Regulatory Commission ("FERC"), and NYISO.

Based on that provision, defendants assert that the parties' relationship is also governed by "federally filed tariffs, [which] set the rates charged and paid for wholesale electricity as well as the procedures for the parties' participation in NYISO-administered auctions for wholesale electric capacity."  RG&E's Memo. (Dkt. #34) at 5.  RG&E further alleges that "these agreements [*i.e.*, the tariffs] establish procedures for rectifying disputes concerning those charges–all matters governed by federal law."  *Id.*  In response, NOCO contends that its claims "have nothing to do with [federally filed] tariffs because NOCO does not challenge the correctness, reasonableness or applicability of NYISO's tariffs or billing ... ."  NOCO's Mem. (Dkt. #23-1) at 10.

Courts addressing questions involving federal jurisdiction over disputes involving utilities have reached varying results.  The reported cases demonstrate that the fact that the parties' relationship relates in some way to federally filed tariffs, while relevant, does not mean that any dispute between them automatically falls within a federal court's jurisdiction.  The question is not simply whether the parties' dispute has *some* connection to federal law, but whether the plaintiff's claims are "based on federal law [and] raise[] issues of federal law."  *Marcus*, 138 F.3d at 52.

In undertaking that assessment, the Court is guided by the "well-pleaded complaint rule," under which the "plaintiff is the master of his complaint and is free to avoid federal jurisdiction by 'pleading only state claims even where a federal claim is also available.'" *Romano v. Kazacos*, 609 F.3d 512, 518 (2d Cir. 2010) (quoting *Marcus*, 138 F.3d at 52).   At the same time, however, there exists "a corollary to the well-pleaded complaint rule–the 'artful pleading' rule–pursuant to which plaintiff cannot avoid removal by declining to plead 'necessary federal questions.'"  *Romano*, 609 F.3d at 518-19 (quoting *Rivet v. Regions Bank*, 522 U.S. 470, 475 (1998)).

Under the artful pleading rule, a court will look beyond the face of the complaint to determine whether the plaintiff has "'cloth[ed] a federal law claim in state garb' by pleading state law claims that actually arise under federal law." *Id.* (quoting *Travelers Indem. Co. v. Sarkisian*, 794 F.2d 754, 758 (2d Cir. 1986)).  If so, the court will "uphold removal even though no federal question appears on the complaint." *Rivet*, 522 U.S. at 475.  "The artful pleading rule applies when Congress has either (1) so completely preempted, or entirely substituted, a federal law cause of action for a state one that plaintiff cannot avoid removal by declining to plead necessary federal questions, or (2) expressly provided for the removal of particular actions asserting state law claims in state court." *Romano*, 609 F.3d at 519 (internal quote and citation omitted).

In the case at bar, NOCO alleges in its breach of contract action that "[b]y erroneously and without authority combining the USEP capacity requirements with those of NOCO and reporting the same to NOCO for purposes of the regular wholesale capacity auctions, RGE breached the terms of the [Operating] Agreement."  Complaint ¶ 41.  NOCO's other causes of action arise from that same basic set of alleged facts.

The question, then, is whether RG&E's alleged breach of its obligations sufficiently implicates federal law to confer jurisdiction over the parties' dispute upon this Court.  As stated, the Operating Agreement governs the parties' relationship, but it does not explicitly set forth all

the terms of that relationship.  The Operating Agreement incorporates by reference the terms of several other documents, and plaintiff does not appear to allege that RG&E directly breached any specific term within the Operating Agreement.[1]

NOCO states that of particular relevance to its claims is RG&E's Electric Supplier Manual ("ESM"), which is one of the documents incorporated by reference into the Operating Agreement.  *See* Shargel Decl. (Dkt. #8-2) Ex. A at 6.[2]  Section 6.6 of the ESM provides that every month, RG&E will provide NYISO with certain data, based on which NYISO will calculate each ESCO's "unforced capacity" requirement.[3]

The Operating Agreement also incorporates the NYISO Installed Capacity Manual ("ICAP Manual"), Dkt. #8-4.  Section 3.5.1 of that manual provides that based on certain data that must be submitted to NYISO each month by each transmission owner, "NYISO shall calculate a preliminary monthly Minimum Unforced Capacity Requirement for each LSE [Load Serving Entity]."  "Load Serving Entity" means "[a]n entity ... authorized or required by law, regulatory authorization or requirement, agreement, or contractual obligation to supply Energy, Capacity and/or Ancillary Services to retail customers located within the NYCA [New York Control Area, *i.e.*, the area under the control of NYISO] ... ."  NYISO Glossary, *available at* http://www.nyiso.com/public/markets_operations/services/customer_support/glossary/index.jsp.

---

[1]The complaint does cite ¶ 1.B of the Operating Agreement, but that paragraph simply incorporates by reference a number of other documents, which include the provisions alleged to have been breached by RG&E.  *See* Dkt. #8-3 at 7-10.

[2]Plaintiff has submitted portions of the ESM issued in November 2007; *see* Dkt. #23-4. The current version of the entire manual is available online at http://www.rge.com/SuppliersAndPartners/electricityescos/.

[3]As the Court of Appeals for the District of Columbia Circuit has put it, " For those unfortunate souls not steeped in the vernacular of electricity regulation," "installed capacity" refers to "the amount of power a generating facility can produce under ideal conditions." "Unforced capacity" means a generator's installed capacity discounted by the generator's "forced outage rate," which "equals the historical percentage of the generator's maximum output lost to forced outages when such output is demanded."  *Keyspan-Ravenswood, LLC v. FERC*, 474 F.3d 804, 807 (D.C. Cir. 2007).

The federally filed NYISO tariff also provides that transmission owners must submit monthly utility load forecast data to NYISO.  *See* Dkt. #23-6.  Based on the submitted data, NYISO allocates charges for aggregate capacity among the ESCOs.  *See id.* §§ 5.11.1, 5.11.3.

In support of its motion to remand, RG&E correctly notes that "federal tariffs are the law, not mere contracts."  *Marcus*, 138 F.3d at 56 (quoting *MCI Telecom. Corp. v. Garden State Inv. Corp.*, 981 F.2d 385, 387 (8th Cir. 1992)).  But as indicated above, that does not answer the question of whether federal jurisdiction exists over this particular dispute.  The Second Circuit in *Marcus* explicitly rejected the proposition "that *every* state law claim challenging a carrier's rates or billing practices necessarily arises under federal law," *id.* at 55, even if those rates or billing practices are governed by federally filed tariffs.

The court in *Marcus* made that statement in the context of an issue concerning whether the plaintiff's claims were preempted by federal law.  In the case at bar, RG&E does not advance a preemption defense, and in fact has disclaimed such an argument.  *See* RG&E's Mem. (Dkt. #34) at 11.  The point remains, however, that there is a meaningful distinction between a claim that *relates* to a federally filed tariff and a claim that is genuinely *based* on such a tariff.

In *Marcus*, the court went on to hold that removal was proper under the artful pleading doctrine, because the plaintiff's claim for breach of warranty necessarily arose from the "*only* contract between [the defendant] and its customers–the tariff filed with the FCC ... ."  *Id.* at 56 (emphasis added).   That tariff, the court said, was "the only possible source" of the parties' agreements.  *Id.*  Accordingly, despite the artful pleading of the complaint, the plaintiffs' breach of warranty claim arose under federal law and was therefore removable. *Id.* at 55-56.  *See also Indeck Maine Energy v. ISO New England*, 167 F.Supp.2d 675, 689-90 (D.Del. 2001) (denying motion to remand where plaintiff's claims were "entirely related to the federal tariff," and plaintiff "sought to present a challenge to a federally-approved tariff in the guise of a state contractual claim").

Here, the complaint itself does not refer to the tariff.  That alone is not dispositive of whether removal was proper, since on a motion to remand, the court may consider materials outside the pleadings, *see Romano*, 609 F.3d at 520.  Indeed, plaintiff does not deny that the tariff is *relevant* to its claims, inasmuch as the tariff requires the submission of monthly load forecast data to NYISO.  But again, relevance is not the determinative question before me.  The question is whether plaintiff's claims *arise* under federal law.

Based on the record before me, I do not agree with RG&E's assertion that "all of the parties' rights and obligations at issue arise under the NYISO Tariff and related documents." RG&E's Mem. of Law (Dkt. 34) at 7.  The fact that some of the parties' rights and obligations originate in documents that are "related" to the tariff is not enough to confer jurisdiction on this Court; if anything, it indicates that the parties have rights and obligations that are independent of federal law.  *See Fax Telecom. Inc. v. AT & T*, 138 F.3d 479, 487 (2d Cir. 1998) (district court erred in taking jurisdiction of case brought by operator of long-distance telephone arcades against provider of long-distance telephone services, arising from provider's failure to file tariff with FCC, since plaintiff's claim was based on alleged contract that was independent of rate on file with FCC, and which was "therefore [wa]s not a simple creature of federal law").

The parties apparently agree that NOCO does not challenge the *rates* set forth in the tariff, and I see no indication in the pleadings that NOCO does so.  Defendants' arguments against remand are based more on the procedures set forth in the tariff regarding the reporting requirements and the means of resolving disputes between the parties.

As demonstrated, however, the provisions concerning RG&E's reporting of certain data to NYISO, and the parties' rights and obligations related thereto, do not arise entirely from the tariff; the reporting requirements are also set forth in documents which, on their face, appear to be governed entirely by state law.

And while the various documents relating to the parties' relationship do provide for certain dispute-resolution procedures, they hardly present a clear, consistent, unified framework.

- 12 -

The tariff sets forth a "process and timeframe for review, challenge, and correction of Customer invoices," Dkt. #8-6 at 15 § 7.4.  The relevant provisions state that "[s]ettlement information ... shall be subject to review, comment, and challenge by a Customer and correction or adjustment by the ISO for errors at any time for up to five (5) months from the date of the initial invoice for the month in which service is rendered ... ."  *Id.* § 7.4.1.1.

Section 5 of the tariff provides for a procedure involving disputes relating to that section of the tariff, which includes the reporting of capacity requirements.  That procedure involves going before an administrator appointed by NYISO's Dispute Resolution Administrator.  Dkt. #23-6 at 89.  The tariff further states that either party may seek review of the arbitrator's decision, within one year after its issuance, before "any federal, state regulatory or judicial authority (in the State of New York) having jurisdiction" over the matter.  *Id.* at 91.

The Operating Agreement, however, also provides for a dispute resolution procedure.  It states that "[a]ny dispute between RG&E and [an ESCO] involving services governed by, or the interpretation or breach of this Agreement and the Contract Documents" must first be submitted by the complaining party to the other party.  If the parties fail to resolve the dispute informally, "either Party *may* initiate a formal dispute resolution process with [FERC]," but the Operating Agreement goes on to state that "[n]othing contained herein shall be construed as a limitation on the right of any Party to pursue any other remedy it may have at law or equity."  Dkt. #8-3 at 13, § 6 (emphasis added).

The agreement further states at section 20, entitled "Applicable Law and Forum," that "[i]nterpretation and performance of this Agreement or the Contract Documents shall be in accordance with, and shall be controlled by, the laws of the State of New York, other than its conflict of laws provisions to the extent they would require the application of the laws of any other jurisdiction."  Dkt. #8-3 at 30.  It also provides that the parties

> irrevocably consent[] and agree[] that that any legal action, motion or proceeding arising under or relating to this Agreement shall be brought in a court of the State of New York, or a Federal court of the United States of America located in the State of New York.  The

[parties] irrevocably waive any objection that either may now or in the future have to the State of New York as the proper and exclusive forum for any legal action, motion or proceeding arising out of or relating to this Agreement or the Contract Documents.

Dkt. #8-3 at 30-31.

What these provisions indicate is that disputes arising under the Operating Agreement are to be decided under New York law, unless New York law would require that such disputes be decided under the law of some other jurisdiction. The parties have also irrevocably consented to have any dispute arising under the agreement heard in state or federal court in New York.

None of those provisions, taken either singly or collectively, are dispositive of the issue of whether this Court has subject matter jurisdiction over plaintiff's claims. As the title of § 20 indicates, these provisions address the parties' choice of law, and their choice of forum. Those are separate issues from subject matter jurisdiction, and for that matter, the existence of subject matter jurisdiction is not a matter that the parties can decide by consent. *See Collins v. Coastline Constr., Inc.*, Civ. No. 92-16, 1992 WL 111203, at *3 ("Subject matter jurisdiction and choice of law present entirely separate inquiries") (citing *International Seafood, Ltd. v. M/V CAMPECHE*, 566 F.2d 482, 485 (5th Cir. 1978)). *See also Ruiz v. Mukasey*, 552 F.3d 269, 273 n.1 (2d Cir. 2009) ("parties cannot consent to the improper exercise of subject matter jurisdiction by a federal court").

Nevertheless, these provisions are indicative of the parties' understanding that they considered the Operating Agreement to be governed by New York law. Consistent with this Court's "virtually unflagging" obligation to hear and decide cases within its jurisdiction, *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S .__, 134 S.Ct. 1377, 1386 (2014), the Court must also strive to give effect to the parties' intent. One of the most fundamental rules of contract interpretation is that the court should give effect to the parties' intent, as revealed by the language of the contract. *See AEP Energy Services Gas Holding Co. v. Bank of America, N.A.*, 626 F.3d 699, 729 (2d Cir. 2010); *Peak Dev., LLC v. Constr. Exchange*, 100 A.D.3d 1394, 1395 (4th Dep't 2012).

The clause stating that an action under the contract could be brought in state or federal court in New York is directed to the question of venue rather than to subject matter jurisdiction. While the parties agreed that an action under the Operating Agreement could be brought in federal court in New York, that clause would only have effect if the action in question stated a claim within a federal court's jurisdiction in the first place.  NOCO was free to bring a claim in state court, based solely on the contract, which by its terms is governed by New York law.  I do not find that by doing so, NOCO has "artfully" pleaded its claims to avoid a necessary federal question.  *See Fax Telecom.*, 138 F.3d at 487 ("the mere presence of a federal issue in a state cause of action does not automatically confer federal-question jurisdiction") (quoting *Merrell Dow Pharms. Inc. v. Thompson*, 478 U.S. 804, 813 (1986)).  *See also Consolidated Edison Co. of New York, Inc. v. Entergy Nuclear Indian Point, LLC*, No. 05-CV-0222, 2006 WL 929208, at *3 (S.D.N.Y. Apr. 7, 2006) (remanding action to state court where "[t]he entire contractual relation between Con Edison and defendants [wa]s not entirely defined by federal law").

In opposition to the motion to remand, RG&E also relies on *New York State Elec. & Gas Corp. v. N.Y. ISO, Inc.* ("*NYSEG*"), No. 00-CV-1526, 2001 WL 34084006 (N.D.N.Y. Jan. 19, 2001).  In *NYSEG*, the court denied a motion to remand claims that, in the court's words, "involve[d] not simple contracts but filed tariffs."  2001 WL 34084006, at *6.  In *NYSEG*, however, the plaintiff was suing NYISO itself, based in part on the federally filed tariff governing their relationship.  In the case at bar, NOCO is suing defendants under a contract that the parties explicitly agreed is governed by New York law.  That contract incorporates by reference the applicable tariff, but NOCO is not suing under the tariff.

RG&E's other arguments generally relate to its motion to dismiss, rather than to removal. For example, RG&E contends that the complaint should be dismissed pursuant to the primary-jurisdiction doctrine, under which a federal court may dismiss an action to allow an appropriate federal agency to rule on the issue at hand.  *See Schaghticoke Tribal Nation v. Kent School Corp. Inc.*, ___ Fed. Appx. ___, 2014 WL 7011937, at *1 (2d Cir. Dec. 15, 2014) (describing primary-

jurisdiction doctrine as "[a] judicial doctrine whereby a court tends to favor allowing an agency an initial opportunity to decide an issue in a case in which the court and the agency have concurrent jurisdiction") (quoting Black's Law Dictionary 1310 (9th ed. 2009)).  That doctrine, however, only applies where "a claim is originally cognizable in the courts" in the first place.  *Id.* (quoting *Golden Hill Paugussett Tribe of Indians v. Weicker*, 39 F.3d 51, 58-59 (2d Cir. 1994)). *See also Southern New England Tel. Co. v. Global NAPS, Inc.*, 624 F.3d 123, 135-36 (2d Cir. 2010) ("a court applying primary jurisdiction to refer a case or issue to an administrative agency *must* have subject matter jurisdiction over the action in order to do so") (citing *Reiter v. Cooper*, 507 U.S. 258, 268-69 (1993)).  See also Sullivan, 424 F.3d at 276-77 (finding removal on preemption grounds improper where the relevant federal statute would require federal court to dismiss action on ground that arbitration panel had primary jurisdiction over parties' dispute)

The same is true as to RG&E's arguments concerning the filed-rate doctrine.  "Under the filed-rate doctrine, 'the right to a reasonable rate is the right to the rate which [FERC] files or fixes, and ..., except for review of [FERC's] orders, the courts can assume no right to a different one on the ground that, in its opinion, it is the only or the more reasonable one.'"  *Entergy Nuclear Vermont Yankee, LLC v. Shumlin*, 733 F.3d 393, 432 (2d Cir. 2013) (quoting *Mont.-Dakota Utils. Co. v. Nw. Pub. Serv. Co.*, 341 U.S. 246, 251-52 (1951)).  As with primary jurisdiction, however, "the filed rate doctrine is not a subject matter jurisdiction issue, but is rather a defense on the merits."  *Perryman v. Litton Loan Servicing, LP*, No. 14-cv-2261, 2014 WL 4954674, at *6 n.4 (N.D.Cal. Oct. 1, 2014) (quoting *Hoover v. HSBC Mortgage Corp. (USA)*, ___ F.Supp.2d ___, No. 3:13-cv-149, 2014 WL 1280441, at *8 (N.D.N.Y. Mar. 27, 2014)); *accord Curtis v. Cenlar FSB*, No. 13-cv-3007 DLC, 2013 WL 5995582, at *2 (S.D.N.Y. Nov. 12, 2013).  *See also Fax Telecom.*, 138 F.3d at 487 ("Although the filed rate doctrine provides a federal defense to the enforcement of this contract, ... Fax's state law breach of contract claim is not an artfully pleaded federal claim in disguise").

In short, the law governing the parties' relationship involves a mixture of state and federal law.  But plaintiff has chosen, as it may, to bring claims that arise only under state law.  I therefore conclude that this case must be remanded to state court, as set forth in the Conclusion of this Decision and Order.  That conclusion renders moot RG&E's motion to dismiss.

## CONCLUSION

Plaintiff's motion to remand this action to state court (Dkt. #23) is granted, and this action is remanded to New York State Supreme Court, Monroe County.

Defendant Rochester Gas and Electric Corporation's motion to dismiss (Dkt. #8) is denied as moot.

IT IS SO ORDERED.

_____
DAVID G. LARIMER
United States District Judge

Dated: Rochester, New York
      March 11, 2015.